# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| SCOTT FITZGERALD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:14-CV-417-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Scott Fitzgerald on November 14, 2014, and a Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 18], filed on June 1, 2015. Plaintiff requests that the July 2, 2013 decision of the Administrative Law Judge denying his claim for supplemental security income benefits be reversed and remanded for further proceedings. On September 8, 2015, the Commissioner filed a response, and Plaintiff filed a reply on September 22, 2015. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for supplemental security income benefits on October 17, 2011. His amended alleged onset date is February 20, 2011. His claim was denied initially and upon reconsideration. Plaintiff timely requested a hearing, which was held on May 14, 2013. The hearing was conducted by video with Plaintiff sitting in Gary, Indiana, and Administrative Law Judge (ALJ) Henry Kramzyk sitting in Valparaiso, Indiana. Also in attendance were Plaintiff's attorney and an impartial vocational expert. On July 2, 2013, the ALJ issued a written decision denying benefits, making the following findings:

1.      The claimant has not engaged in substantial gainful activity since October 17, 2011, the application date.

2.      The claimant has the following severe impairments: status post reduction and fixation of left knee fracture and left wrist fracture, status post non-displaced sacrum fracture, and borderline intellectual functioning. The claimant also has a history of and continues to engage in some alcohol abuse.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently. He can sit up to six hours and can stand/walk up to 6 hours in an 8-hour day. He can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, or crouch, but can never kneel or crawl. He can frequently use his left non-dominant hand. He is able to understand, remember, and carry out short, simple, repetitive instructions. He is able to sustain attention and concentration for 2-hour periods at a time, but can sustain attention for 8-hours in the workday for short, simple, repetitive instructions. He can use judgment in making work decisions related to short, simple repetitive instructions. He requires an occupation with set routine and procedures and few changes during the workday; no fast paced production work. He can maintain regular attendance and be punctual within customary tolerances. He can perform activities within a schedule. He must avoid even moderate exposure to wetness, including wet, slippery, uneven surfaces, and hazards, such as unprotected heights.

5.      The claimant is capable of performing past relevant work as a sales attendant as is generally performed. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

6.      The claimant has not been under a disability, as defined in the Social Security Act, since October 17, 2011, the date the application was filed.

(AR 19-43).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning

of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as

an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite

his limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand for further proceedings, arguing that the ALJ failed to (1) properly analyze whether Plaintiff satisfied the requirements of Listing 12.05; (2) properly determine the RFC based on the evidence of record; and (3) properly evaluate Plaintiff's credibility. The Court considers each of Plaintiff's arguments in turn. Before doing so, the Court acknowledges the thorough and detailed examination of the record conducted by the ALJ as well as the ALJ's attention to analyzing each step of the sequential analysis. Remand is nevertheless required because pivotal conclusions are based on unsupported speculation about the meaning of the evidence of record. *See Moss v. Astrue*, 555 F.3d 556, 560-61 (7th Cir. 2009) (noting that the ALJ may not rely on speculation or conjecture to reject a medical source opinion); *Blakes ex. rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (indicating that the ALJ must base his decision on the record, not a hunch); *White ex. rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence.").

## A. Listing 12.05

At step three of the disability evaluation process, the ALJ determines whether a claimant's impairments meet or equal the criteria of a Listing of Impairments, and, if they do, the claimant will

be found disabled. 20 C.F.R. § 416.920(a)(4)(iii). An individual suffering from an impairment that meets the description of a listing or its equivalent is conclusively presumed to be disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Kastner v. Astrue*, 697 F.3d 642, 646-47 (7th Cir. 2012). In order "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). An impairment that manifests only some of the criteria will not qualify, no matter its severity. *Id*. A claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)).

Plaintiff asserts that he should be evaluated under Listing 12.05C because of his Full Scale IQ score of 70 and his severe physical impairments. Listing 12.05 for Mental Retardation[1] provides, in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.
>
> . . . .

---

[1] In August 2013, the terminology for Listing 12.05C was changed from "mental retardation" to "intellectual disability." 78 Fed. Reg. 46499-01 (2013). Because Plaintiff's case was decided in July 2013, the terminology "mental retardation" is still applicable.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C.

The prerequisite to satisfying Listing 12.05 is establishing the diagnostic description set forth in the introductory paragraph that the claimant have "deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A (providing that the "structure for the listing for mental retardation is different from the other mental disorders listings" because the listing is satisfied if the claimant satisfies the diagnostic description and any one of the four sets of criteria); *Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 939 (N.D. Ind. 2012). Under subpart C, the requirement of an "additional and significant work-related limitation of function" is satisfied when a "severe" impairment is found in step two. *King v. Barnhart*, 1:06-CV-381, 2007 WL 968746, at *3 (S.D. Ind. Feb. 26, 2007).

At the age of 42, Plaintiff scored a Full Scale IQ score of 70 during a consultative psychological evaluation by David R. Bucur, Ph.D., H.S.P.P., a licensed clinical psychologist. In his report, Dr. Bucur concluded:

> Scott currently functions within the Borderline range of intellectual functioning with a WAIS-IV Full Scale IQ score of 70. This finding appears consistent with his level of behavioral functioning (e.g. had driver's license, maintained hands-on employment, no high school diploma/GED, maintained long-term romantic relationship). Therefore, the above results appear to provide an accurate reflection of Scott's current level of functioning.

(AR 299). Courts have recognized that, absent trauma that can cause mental retardation, there is a "presumption that IQ remains relatively constant throughout life and thus IQ tests performed after the claimant is 22 can be used to show a claimant's IQ during the manifestation period." *Miller v. Colvin*, No. 3:13-CV-380, 2014 WL 4105034, at *12 (N.D. Ind. Aug. 19, 2014); *see also Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986) (assuming that the plaintiff's IQ score was valid back

to the date of onset, rather than only as of the first date of testing (citing *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985)).

The ALJ made errors in his step three determination when he decided that Plaintiff does not meet the requirements of Listing 12.05C on the basis that there is no objective medical evidence of onset before age 22. First, the ALJ discounted the Full Scale IQ score of 70 on the basis that Plaintiff was 42 years old when he earned the IQ score and because Plaintiff's school records did not report an IQ score. (AR 21). This reasoning impermissibly turns the presumption on its head. The lack of an IQ score before the age of 22 is the reason the current IQ score is being considered to show Plaintiff's IQ during the manifestation period. *See Guzman*, 801 F.2d at 275 ("[T]here may be many reasons that an individual had not taken an IQ test at an earlier point in his life and . . . this fact should not preclude a finding of earlier retardation.").

Next, the ALJ significantly discounted whether Plaintiff had "deficits in adaptive functioning initially manifested during the developmental period" on the basis that Plaintiff's assertion that he was in special education is based only on his testimony and not on his educational records. The ALJ listed the names of Plaintiff's classes for his freshman year, commenting that there is no "designation or indication any of the classes were special education." (AR 21). However, the ALJ did not describe the course names listed for Plaintiff's sophomore year, all of which appear to be "basic" classes, with the exception of physical education. (AR 256). Distinguishing honors courses, regular courses, and basic courses, the transcript explains that "basic courses emphasize fundamental work in the subject matter." *Id.* The ALJ should have discussed these basic classes before discounting Plaintiff's testimony that he was in special education. Plaintiff also consistently reported on his application for disability benefits, at the consultative psychological evaluation, and at the

hearing that he had been in special education. As discussed in the next section, the ALJ erred in several aspects of the credibility determination, which affects the weight given to Plaintiff's testimony about special education.

In addition, Plaintiff consistently earned low grades in his courses, earning one C, two Ds, and two Fs the first semester of his freshman year; one C, one D, and three Fs the second semester of his freshman year, and one C, four Ds, and seven Fs in his basic classes and regular physical education classes his sophomore year. *Id*. The ALJ reasoned that Plaintiff's poor grades do not, "per se, prove an individual has the 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' required by the Listing," explaining that there are numerous other reasons for low grades such as could be the result of poor study habits, behavioral traits that interfere with the educational process, absenteeism, substance abuse, or lack of motivation. (AR 21). The ALJ notes that the educational record shows that Plaintiff missed 25 days of school in one semester his freshman year. (AR 22 (citing (AR 256))). All of the reasons posited by the ALJ are speculation. The proper course would have been for the ALJ to question Plaintiff about the alternative explanations at the hearing rather then speculating in the decision to discredit Plaintiff's given explanation. *Carrasco v. Colvin*, No. 14 C 1306, 2015 WL 3397059, at *11 (N.D. Ill. May 26, 2015).

Next, the ALJ hypothesizes that "the possibility exists that his significant long-term alcohol abuse negatively impacted his intellectual functioning at the later evaluation." (AR 22). This is mere speculation, as nothing in the record suggests that Plaintiff's self-reported alcohol use currently affects his intellectual functioning or that he was abusing alcohol his freshman and sophomore years in high school to the point of affecting his grades. In fact, the ALJ admits the speculation, indicating

that there is a "possibility" that alcohol abuse negatively impacted Plaintiff's subsequent intellectual functioning. *Id.* The evidence of "alcohol abuse" is a past conviction for operating while intoxicated as well as Dr. Bucur's notations from the clinical interview that Plaintiff indicated "that he consumes alcohol 'whenever [he] can'" and that he "reported past alcohol abuse and current alcohol consumption two to three times a week." (AR 22 (citing (AR 297))). Yet, Dr. Bucur, aware of Plaintiff's alcohol use, nevertheless verified his IQ score. This speculation cannot be used to reason that Plaintiff did not have an onset prior to age 22.

The Commissioner argues that "Plaintiff's self-reported alcohol abuse may have contributed to a reduction in IQ score," citing *Peterson v. Commissioner of Social Security*, No. 13-5841, 2014 WL 223655, at *7 (6th Cir. Jan. 21, 2014). (Def. Br. 5). The court in *Peterson* found that documented history of alcohol abuse was evidence of a loss in adaptive functioning occurring after the developmental stage because the abuse was "robustly documented" and the claimant had "been diagnosed with alcohol dependency or abuse by every relevant professional who evaluated him." *Id.* Here, documentation of Plaintiff's alcohol use is far from "robust" as the medical records only make note of self-reported past alcohol use without offering further analysis. Furthermore, nothing in the record suggests that Plaintiff was diagnosed with alcohol dependency or abuse, let alone evaluated for such conditions. The ALJ did not identify anything in the record that suggests Plaintiff's alcohol use caused a loss in adaptive functioning after the developmental stage. And, again, Dr. Bucur verified the IQ score.

As another basis for finding that Plaintiff does not meet Listing 12.05C, the ALJ reasoned that Dr. Bucur "noted GAF was 'undetermined,' indicating the impact of the diagnosis of borderline intellect on functioning was not readily apparent." (AR 21). The ALJ's conclusion about the

meaning of the "undetermined" designation is of his own creation and unsupported by the record. Dr. Bucur offered no explanation in his report for why he did not assign a GAF score and made no conclusion about how his decision not to determine a GAF score impacts the meaning of the diagnosis. The portion of the record cited by the ALJ is the conclusion of the report, a "Diagnosis" that sets out, in list form, the DSM IV Axis I through V diagnoses:

| DSM IV | AXIS I | No diagnosis |
|--------|--------|--------------|
| | AXIS II | V62.89 Borderline Intellectual Functioning |
| | AXIS III | Defer to Physician |
| | AXIS IV | Occupational Problems |
| | AXIS V | GAF - Undetermined |

(AR 299). The ALJ again drew an unsupported inferences from the medical record.

Next, the ALJ found Plaintiff's history of performing skilled work and other activities to be inconsistent with adaptive deficits and mental retardation. The ALJ found the fact that Plaintiff maintained past relevant work as a dispatcher for the Salvation Army in 2002-2003, which the vocational expert testified to be a "skilled" job, belied Plaintiff's assertion that his impairments meet Listing 12.05C. The ALJ noted that Plaintiff testified to having performed the job for a year, which the ALJ interpreted to mean that he did the job adequately and without accommodation. The ALJ noted that the job included recording stops, logging the driver, and keeping track of incoming donation calls, all of which the ALJ found to be inconsistent with "significantly subaverage general intellectual functioning." (AR 22); *see also* (AR 190 (Work History Report for "truck dispatcher" position)). Plaintiff questions whether the vocational expert's evaluation of the job as "skilled" is accurate, noting that if the job were indeed "skilled" with an SVP of 5, it would have taken between

six months to a year to learn, which is almost the entire time that he held the job. Plaintiff also notes that he was paid close to minimum wage, questioning whether it was truly skilled. The job was for the Salvation Army and involved dispatching the trucks to pick up donations. Before negative inferences are drawn about Plaintiff's short employment in this position, further information about the demands and expectations of the job is required to determine whether it was in fact skilled. *See King*, 2007 WL 968746, at *4 (finding that the plaintiff's ability to hold a number of different jobs, almost always for brief periods, before his physical impairments became severe, along with several other factors, did *not* disqualify the plaintiff from meeting the criteria of the opening paragraph of Listing 12.05).

The ALJ found the fact that Plaintiff did not report the dispatcher job as past work during the consultative psychological examination with Dr. Bucur to be a "curious and misleading omission." (AR 22). The ALJ makes the legal distinction between "skilled" and "unskilled" work in drawing this conclusion, insinuating that Plaintiff purposefully omitted the dispatcher job because it is "skilled" and, thus, he would look less disabled to Dr. Bucur. *Id*. However, the ALJ did not ask Plaintiff about the omission. Plaintiff is not an attorney. There is no evidence that he was familiar with the distinction between "skilled" and "unskilled" work or understood what impact the dispatcher job may or may not have on Dr. Bucur's opinion. Perhaps Plaintiff forgot; Plaintiff held that job in 2002 and 2003 and the consultative examination took place in 2011. Perhaps the examiner omitted the job from his notations. Without more, it is inappropriate to impute a malicious intent to Plaintiff.

In finding that Plaintiff had not shown "deficits in adaptive functioning," the ALJ also noted that Plaintiff previously acquired a driver's license, which he lost because of a conviction for driving

under the influence, and that he previously worked on cars and built motor bikes. The ALJ found that Plaintiff's allegation in his testimony as to some memory problems is inconsistent with his statement on the Function Report-Adult, where he did not check "memory" as an item that his 'illness, injuries, or conditions" affect and his report during the consultative physical exam that his memory was "good." (AR 203, 292). These details alone do not demonstrate the lack of deficits in adaptive functioning, especially in light of the unsupported conclusions and inferences by the ALJ throughout the step three analysis.

Finally, Plaintiff argues that no doctor discussed Listing 12.05, and, therefore, the ALJ made the Listing assessment solely on his own lay opinion. However, the ALJ is responsible for determining medical equivalence. 20 C.F.R. § 416.926(e) ("For cases at the administrative law judge . . . level, the responsibility for deciding medical equivalence rests with the administrative law judge . . . ."). And, the ALJ considered the required evidence in making that determination, namely "all evidence in [Plaintiff's] case record about [Plaintiff's] impairment(s) and its effects on [Plaintiff] that is relevant to this finding" and "the opinion by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 416.926(c). Specifically, the ALJ considered the December 30, 2011 Mental Residual Functional Capacity Assessment completed by Dr. Kladder, a state agency reviewing psychologist, who assessed Plaintiff under Listing 12.02 and 12.09. Dr. Kladder considered those Listings as a result of the Psychiatric Review Technique form on which Dr. Kladder noted the disorder of borderline intellectual functioning. The ALJ was required to consider the medical opinion; the ALJ was not bound to follow it. *See Young v. Astrue*, No. 12-317, 2013 WL 501752, at *5 (S.D. Ind. Feb. 8, 2013). Accordingly, the ALJ followed the proper procedure.

Based on the foregoing, the Court remands this case to allow the ALJ to consider all the evidence in the record, to properly analyze Plaintiff's Full Score IQ of 70 in light of his educational and work history, and to resolve the errors in assessing Plaintiff's credibility and analyzing the medical evidence discussed in the following section so that the ALJ can build a logical bridge between the evidence and the analysis of whether Plaintiff meets the requirements of Listing 12.05C.

## B. Residual Functional Capacity and Credibility

Several errors with the ALJ's analysis of the medical evidence and the evaluation of Plaintiff's credibility can be remedied on remand. The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.945(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*.

In making a disability determination, the ALJ must consider a claimant's statements about his symptoms, such as pain, and how the symptoms affect his daily life and ability to work. *See* 20 C.F.R. § 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 416.929(c)(3). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)); SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

      The ALJ discredited Dr. Bucur's finding that Plaintiff had an IQ of 70 because during the examination Plaintiff's speech was "coherent and presented at a normal rate" and Plaintiff "made appropriate eye contact." (AR 30). The ALJ suggested that this raised questions of "symptom magnification." *Id*. Yet, Dr. Bucur provided the diagnosis of borderline intellectual functioning and verified the IQ score. The ALJ further discredited the evaluation because low intellectual functioning was not mentioned in the *physical* consultative exam or any other part of the medical record. Although it is possible for a physical exam to make note of psychological impairments, the absence of such a notation is not necessarily evidence that no psychological impairment exists. An

ALJ cannot discredit the opinion of a medical examiner based on an absence of corroborating medical opinion. *Herrmann v. Colvin*, 772 F.3d 1110, 1111 (7th Cir. 2014) ("The administrative law judge seems to have thought that a physician's evidence can be disregarded unless he has detailed notes to back it up and other physicians provide identical evidence even if they don't contradict him—in other words no credibility without corroboration. These are insufficient grounds for disbelieving the evidence of a qualified professional."). Moreover, a physical evaluation is not necessarily intended to anticipate or test for psychological impairments.

Similarly, the ALJ suggested that Plaintiff was magnifying his symptoms because at the psychological evaluation Plaintiff walked slowly, was unsteady, and grimaced, gestures that the ALJ states were not noted during Plaintiff's physical consultative or any other evaluation. Yet, the physical consultative examination indicates that Plaintiff had "gait difficulty" and a "limping gait" due to pain in Plaintiff's knee. (AR 292, 293, 294).

In finding Plaintiff not fully credible, the ALJ made several statements regarding periods of time in which Plaintiff did not seek medical treatment or treatment regimens that Plaintiff did not pursue. However, the ALJ failed to address testimony that Plaintiff could not afford treatment due to financial difficulties and a lack of insurance. (AR 69). Even the free clinic required a $25 co-pay that Plaintiff could not afford. *Id*. Before an ALJ may find that an intermittent treatment history or a claimant's refusal to follow a treatment plan undermines the claimant's credibility, "an ALJ must first explore the claimant's reasons for the lack of medical care." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (citing SSR 96-7p, 1996 WL 374186, at *7; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft*, 539 F.3d at 679). The ALJ may need to inquire whether there are good

reasons, such as the inability to afford treatment, for the sporadic treatment history by asking the claimant at the hearing. *Id.* (citing SSR 96-7p, 1996 WL 374186, at *7-8).

The ALJ raised questions of "drug-seeking behavior" based on the ALJ's misunderstanding of the record. (AR 26). The ALJ stated that Plaintiff was prescribed 30 Norco tablets with instructions to take one every six hours as needed for pain, yet he came back after only five days for a refill. (AR 26). Plaintiff was given the prescription on September 5, 2011, after falling and fracturing his tailbone. (AR 261). The record shows that Plaintiff was in fact prescribed 20 tablets, which would mean Plaintiff took the medication exactly as prescribed (four pills a day for five days). (AR 267). Yet, based on his misunderstanding of the record, the ALJ wrote, "His request for more narcotic pain medication so soon after he was provided with 30 tablets raises questions about drug-seeking behavior, especially given his history of alcohol abuse." (AR 26). The ALJ continued his misunderstanding of the record by assuming that Plaintiff lied at that same visit when "he denied taking any current medication, indicating he had already taken the 30 Norco provided, obviously overusing medication." (AR 26). The record, dated September 10, 2011, provides: "Patient has not been taking medications since 9/10/2011." (AR 289). In other words, as of the day of the visit, Plaintiff had not been taking medication. The logical explanation for that notation is that Plaintiff had finished his prescription of 20 pills the day before, as expected. This additional accusation is also unfounded.

In the same paragraph, discussing the Norco tablets and Plaintiff's follow up visit five days after he fell and fractured his tailbone, the ALJ went to lengths to suggest that Plaintiff could not have been in pain, finding that "the diagnosis of low back pain/neuralgia is given minimal weight" because "it is unsupported by any contemporaneously documented clinical abnormalities and is only

slightly consistent with the other substantial evidence in [the] record, specifically hospital records of the prior coccyx fracture." (AR 26). The ALJ then suggests that Plaintiff was prescribed Norco on September 10, 2011, "apparently simply due to his request." *Id*. The ALJ failed to explain why Plaintiff would not still be in significant pain five days after fracturing his tailbone. Plaintiff reported acute coccyx pain as well as pain and tenderness on the top of the left foot. (AR ). While the ALJ noted these reports, he then discredited them because of the notation in the same record that Plaintiff "was in no apparent distress." There is no notation in the record that Plaintiff requested more narcotic pain medication. The ALJ's conclusion that Plaintiff could not have been in pain on September 10, 2011, is unsupported.

Finally, the ALJ discredited Plaintiff based on the statement in the September 10, 2011 follow up visit "Plan" that Plaintiff was "[g]iven exercises to improve back strength and promote mobility," (AR 289). The ALJ wrote, "[T]here is no objective evidence in [the] record that the claimant complied with that medical instruction." (AR 27). The nurse practitioner could have made such a notation in the October 10, 2011 follow up visit notes; but she did not. *See* (AR 384-90). Nor did the ALJ ask Plaintiff at the hearing whether he did the exercises. The negative inference is unfounded.

Later in his decision, the ALJ returned to the unfounded assertion of "drug seeking behavior." (AR 28). In discussing the consultative physical examination with Dr. Bautista, the ALJ wrote, "While the claimant then alleged that he 'stopped taking the Norco[sic] [because he was] afraid of the addictive effects,' that allegation is grossly inconsistent with the fact that medical records from East Chicago Community Health Center documented the claimant repeatedly requesting that narcotic pain medication." (AR 28). There is no such documentation. The records

from East Chicago Community Health Center are the records from September 5, 2010, September 10, 2011, and October 10, 2011, all in relation to Plaintiff's fractured tailbone discussed above.

The ALJ erred in concluding that Plaintiff attempted to embellish the extent of his injuries when he referred to his 2008 "open reduction and internal fixation" operation as a knee "replacement" when he presented at the hospital in 2011 after falling and breaking his tailbone. (AR 25). Plaintiff, who has limited mental abilities, is a layperson, not a physician. He was presenting at the hospital because he fell and injured his back, reporting severe pain of 7 or 8 out of a scale of 10, with 10 being the most pain. (AR 276). His inartful description of the procedure that was done to his knee years earlier hardly goes to his credibility or demonstrates that "he was trying to make himself out as more impaired than he actually was." (AR 25). There is no evidence that Plaintiff was seeking treatment at the hospital for purposes of obtaining social security benefits; he was seeking treatment. Moreover, the open reduction and internal fixation procedure involves the insertion of an "internal fixation device" in the bone, such as screws, plates, rods, or pins.[2] Perhaps Plaintiff actually thought his knee was replaced or he equated the insertion of a fixation device as a "replacement." Notably, Dr. Bucur noted the history of "left ORIF with screws, pins, and metal braces" at the consultative psychological examination. (AR 292). Thus, it does not appear that there was any attempt at "misrepresentation" at that examination.

Yet, the ALJ made similar accusations of exaggeration regarding several other notes in Dr. Bucur's consultative psychological evaluation. (AR 29-30); (AR 296-99). First, the ALJ again questioned Plaintiff's report of special education; as noted above, the ALJ failed to recognize that

---

[2] http://www.mountsinai.org/patient-care/health-library/treatments-and-procedures/open-reduction-and-internal-fixation-surgery (last visited 2/8/2016).

Plaintiff was in basic classes his sophomore year and the ALJ did not question Plaintiff at the hearing about the nature of his special education classes. Next, the ALJ again criticized Plaintiff for failing to mention his dispatcher work; as discussed above, there are many explanations for this omission, and the ALJ did not question Plaintiff about them at the hearing.

Third, the ALJ accused Plaintiff of making an "obvious exaggeration" when he told Dr. Bucur that he "broke his back" in 2011. (AR 29); (AR 297). But Plaintiff did break his back—at least in lay terminology—as he fractured his tailbone, at the end of the spine. Notably, Plaintiff reported to Dr. Bautista, the consultative physical examiner, that he "broke his lower back" in 2011, and Dr. Bautista did not question this report—if those were even Plaintiff's words and not Dr. Bautista's. (AR 292). Because, in the same report, Dr. Bautista wrote that it was a "broken tailbone." And, Dr. Bautista followed Plaintiff's statement that he "broke his lower back" with a review of the September 5, 2011 x-ray that "showed acute essentially non-displaced fracture through the distal sacrum." (AR 292). There is no indication that Dr. Bautista felt Plaintiff was exaggerating. Plaintiff telling Dr. Bucur at the psychological evaluation that he "broke his back" was not an "obvious exaggeration."

Fourth, the ALJ discredited Plaintiff based on a "report" to Dr. Bucur that he had not undergone surgery for his carpal tunnel syndrome. (AR 29). The ALJ wrote that Plaintiff "neglected to mention that the only treatment prescribed was wrist splints" and that his statement that he did not get surgery for the carpel tunnel was "grossly misleading, as surgery had not even been suggested." (AR 29). There are three problems with this unsupported conclusion. First, there is no reference to surgery in Dr. Bucur's report; the only reference to carpal tunnel syndrome is the statement on two occasions that "[h]e also reported carpal tunnel." (AR 297, 299). Second, there is

a statement in Dr. Bautista's report regarding carpal tunnel surgery: "He has carpal tunnel syndrome in the right hand, but no surgery has been done." (AR 292). It is not at all apparent from this statement that Plaintiff himself offered that information rather than Dr. Bautista noting the answer to a question posed to Plaintiff. Third, if Plaintiff did offer the fact that he had not had surgery, it is not misleading to state that one has not had surgery when one has in fact not had surgery.

Fifth, the ALJ discredited Plaintiff for reporting gout to Dr. Bucur. (AR 29); (AR 297, 299). The ALJ is correct that the administrative record does not contain any medical record of a diagnosis of gout. There is evidence that Plaintiff was not insured and sought sporadic treatment from free clinics. The ALJ did not question Plaintiff at the hearing about gout, such as when was he diagnosed with gout, who diagnosed him, what his prognosis was, and why there are no records of such a diagnosis. Notably, Plaintiff also reported gout to Dr. Bautista, stating that he broke both his ankles but didn't have surgery because of gout, that his ankles snap and pop, and that he is in pain on and off. (AR 292). The ALJ did not question Plaintiff about this report, which is rather detailed for someone who is exaggerating. Nor did the ALJ note Dr. Bautista's physical examination finding that Plaintiff had pain in both ankles. The Court recognizes that Dr. Bautista noted no swelling in either foot and did not give a diagnosis of gout. (AR 293). Nevertheless, in light of Plaintiff's sporadic treatment history and treatment from different providers, further inquiry on the alleged history of gout should have occurred before a negative inference was drawn.

Sixth, the ALJ found that Plaintiff exaggerated his work history to Dr. Bucur when he said that he worked for five years in construction, which the ALJ found inconsistent with the Work History Report. (AR 29). The Work History Report asks for a listing of all jobs held in the fifteen years before becoming unable to work. (AR 186). Plaintiff has earnings history for the years 1990,

1991, 1992, 1994, 1995, and 1996. (AR 167). Perhaps Plaintiff worked in construction during those years, all of which were before his physical impairments appeared and which were before the fifteen year reporting period on the Work History Report. The ALJ did not ask Plaintiff at the hearing what he meant when he told Dr. Bucur that he worked for five years in construction. Also, Plaintiff accurately reported to Dr. Bucur that he "was most recently employed as a hazardous waste remover for 8 months." (AR 297). The ALJ went so far as to suggest that Plaintiff was not credible because the "successive years with no reported earnings on the Certified Earnings Record raise questions about possible periods of incarceration." (AR 30). Once again, the ALJ did not question Plaintiff about why he did not have reported income from 2004 through 2007. The ALJ's unsupported speculation and the resulting negative inference was in error.

At the outset of his discussion of the medical evidence, the ALJ found the hospital records from June 10, 2008, when Plaintiff was hit by a motorcycle while riding a bike, to be inconsistent with borderline intellectual functioning. (AR 24). The ALJ noted that the records showed that his mental state at the hospital was "unaltered;" that the records "did not document any clinical observations of the claimant having anything other than normal intellectual functioning," which the ALJ felt would have been noted since Plaintiff was not wearing a helmet; and that the records documented that Plaintiff's "mentation was 'appropriate for stated age.'" (AR 24). "Mentation" is defined as "mental activity." http://c.merriam-webster.com/medlineplus/mentation (last visited Feb. 8, 2016). Although it is fair to recognize the notation that Plaintiff's mental activity was appropriate for his age, the leap to suggest that this notation does *not* support some mental impairment such as borderline intellectual functioning or mild mental retardation is too great, especially when there is

no indication that his level of intellectual functioning was tested at the hospital much less considered. Plaintiff presented to the emergency room for treatment of his physical injuries.

The ALJ also discredited Plaintiff on the basis that he "alleged he had had a 'stent placed' a few years earlier, an allegation uncorroborated by any medical evidence in record theretofore or subsequent . . . ." (AR 25). This is another misstatement of the record by the ALJ. On February 20, 2011, Plaintiff presented at the hospital for chest pain, with his right arm numb and pain in his leg that started four days earlier and was getting worse with slight shortness of breath but no nausea. (AR 276). The hospital report provides that Plaintiff "states *was to have a stent put in* a few years ago but never did." *Id*. (emphasis added). This is a different statement than the one attributed to him by the ALJ. Although true that there are no records of a history of treatment for a heart condition in the administrative record, it is a stretch to accuse someone of saying that he had a stent put in when he in fact said he was going to have a stent put in. The ALJ could have questioned Plaintiff at the hearing about this medical history rather than making an unsupported inference of negative intention.

There are several more examples of the ALJ impermissibly using the record to improperly discredit Plaintiff and to suggest that Plaintiff was "seeking secondary gain." (AR 28). The ALJ suggested that there was no evidence that Plaintiff's leg gives out on him regularly, (AR 27), but Plaintiff broke his tailbone after falling when his knee gave out, (AR 262), and he fell again in the bathtub in 2012, (AR 336). The ALJ asserted that at the physical consultative exam with Dr. Bautista, which took place on December 16, 2011, Plaintiff's refusal to attempt back range of motion based on allegations of pain was inconsistent with the medical record "which contained no clinical documented back abnormalities." (AR 28). Yet, only three months earlier, Plaintiff fractured his

tailbone. Similarly, the ALJ asserted that there was no hip issue and, therefore, disbelieved Plaintiff's inability to perform hip range of motion at the examination by Dr. Bautista. (AR 28). However, Dr. Bautista, in the same record, noted that Plaintiff was unable to do range of motion of either hip due to low back pain and left knee pain, both of which Plaintiff has a history of. (AR 293). Dr. Bautista further reported that Plaintiff had low back pain with non-displaced fracture through the distal sacrum. (AR 294).

Discussing the April 2012 visit for right hip and back pain after slipping in the bathtub, the ALJ assumed that the hospital's finding of a Morse Fall Risk of "0" meant that Plaintiff himself denied any history of falling. (AR 31). There is no indication in that medical record that Plaintiff was asked about a history of falling. Moreover, the Morse Fall Risk score of "0" is suspect in itself because one of the elements of the Morse Fall Risk is whether there is a history of falls, and Plaintiff was at the hospital because of a fall. (AR 347).[3] The ALJ discredited Plaintiff for wanting to "establish care" just before his hearing in 2013; yet, Plaintiff testified that he could not afford care until he qualified for a voucher from the Gary Township Trustee the month before the hearing. (AR 69). The ALJ found that Plaintiff's "allegation that he 'stopped working' when he was 'run over' is most misleading, as it implies an otherwise stellar work record." (AR 37). This is again an improper insinuation; Plaintiff last worked in 2008, when he was hit by the motorcycle, injuring his left knee and left wrist. There is no language or context to suggest an insinuation by Plaintiff of a stellar work record.

The ALJ placed significant weight on the fact that Plaintiff's subjective complaints of pain were unsupported by objective medical evidence. However, the record shows that Plaintiff had a

---

[3] http://www.networkofcare.org/library/Morse%20Fall%20Scale.pdf (last visited Feb. 8, 2016).

tailbone fracture, wrist surgery, knee surgery, and a bone fragment in his wrist. It can hardly be said that Plaintiff's subjective complaints are unsupported by any objective medical evidence in the record. Should the ALJ continue past step three of the sequential analysis, he is directed to explain any reliance on gaps in Plaintiff's medical treatment and employment, any omission and statement made to medical examiners, and the reason for discrediting any objective medical evidence.

Finally, Plaintiff argues that the ALJ improperly assessed the opinion of Nurse Practitioner Key's RFC assessment as deserving no weight. The Court disagrees for the most part. The ALJ set out several explicit and well supported reasons for discounting her assessment, most importantly that her assessment was based on only two visits that had occurred sixteen months prior to the written assessment and on which she opined that his impairment was not expected to last more than twelve months. However, the ALJ overstepped by criticizing her for not addressing knee, wrist, or hand complaints; Plaintiff's visits to nurse Keys were for his back pain in September and October 2011 following his fall. (AR 286-91). There is no indication that she assessed his knees, wrists, or hands. Nor is there support for the ALJ's accusation that nurse Keys drafted the report to "wilfully mislead the reader to think there was a long-term treating relationship from September 2011 to May 2013." (AR 34). The date of May 2013 is on the line for the date that she completed the form, and she indicated on the first page that she saw Plaintiff monthly for two months; there is no indication that she purposefully intended to mislead by conveying a sixteen-month treatment record. *See* (AR 394, 398). Finally, despite giving the opinion "no weight," the ALJ nevertheless concluded by giving her opinion "full weight" on the check box where she indicated that Plaintiff has no significant limitations with reaching, handing, or fingering; this is improper given that he otherwise gave her opinion no weight and that she did not treat Plaintiff for hand issues. (AR 34).

## C. Request for an Award of Benefits

An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Based on the discussion above, remand, not an immediate award of benefits, is appropriate.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 18], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order. The Court **DENIES** Plaintiff's request to award benefits.

So ORDERED this 8th day of February, 2016.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT